ROSHAN D. SHAH, ESQ.
**ANDERSON & SHAH, LLC**
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Telephone: (732) 398-6545
Facsimile: (732) 576-0027

MARISSA ROSETTI, ESQ. (*pro hac vice forthcoming*)
**THE SIKH COALITION**
165 Broadway, Office 2359
New York, NY 10006

JOSHUA C. MCDANIEL, ESQ. (*pro hac vice forthcoming*)
PARKER W. KNIGHT III, ESQ. (*pro hac vice forthcoming*)
KATIE A. MAHONEY, ESQ. (*pro hac vice forthcoming*)
**HARVARD LAW SCHOOL**
**RELIGIOUS FREEDOM CLINIC**
6 Everett Street
Wasserstein Hall, 5th Floor
Cambridge, MA 02138
*Attorneys for Plaintiff Prabhjot Singh*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| PRABHJOT SINGH, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA; FEDERAL BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI FORT DIX WARDEN RACHEL THOMPSON, in her official capacity; LIEUTENANT DEJESUS, in his individual and official capacities; LIEUTENANT K., in her individual and official capacities; CORRECTIONS OFFICER SUMNERS, in his individual and official capacities; JOHN DOES 1-10, in their individual and official capacities; <br><br> Defendants. | Civil Action No. <br><br><br> **CIVIL ACTION** <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1.      This action arises from Defendants' repeated violations of Plaintiff Prabhjot Singh's religious rights. Prison officials at FCI Fort Dix have routinely subjected Singh to discriminatory and abusive treatment because of his Sikh faith, without provocation and despite his perfect disciplinary record.

2.      In one egregious incident, correctional officers deliberately destroyed Singh's holy turban, first trampling it under their boots and smearing it with spilled paint, then tossing it in the trash in a restricted area. Officers also desecrated a second turban and Singh's holy book. These actions are deeply traumatizing to Sikhs like Singh.

3.      This incident was part of a broader pattern of discriminatory and abusive treatment by Defendants, who openly mock and ridicule Singh's religious practices.

4.      Defendants refuse to properly accommodate Singh's Sikh dietary restrictions. As a result, Singh must buy food from the commissary and often cannot eat sufficient nutrients.

5.      Defendants delayed Singh's medical care and withheld prescribed lung medication for months, causing Singh to spend weeks hospitalized with bronchitis. Singh has also been unable to access mental health services, which he has repeatedly sought to help cope with the trauma and distress caused by Defendants' actions.

6.      Finally, when Singh submitted a formal grievance (Remedy ID 1169270-A1), Defendants retaliated against him. Defendants threatened him with transfer to a higher security facility and solitary confinement, withheld time-sensitive mail, and refused to allow him to meet privately with his attorneys during an attorney visit.

7. This ongoing discriminatory conduct violates the religious protections Congress established in the Religious Freedom Restoration Act (RFRA), renders the federal government liable for intentional infliction of emotional distress under the Federal Tort Claims Act (FTCA), and violates Singh's Eighth Amendment right to adequate food and medical treatment. For all these violations, Singh seeks all available relief to hold Defendants accountable for their egregious and illegal actions.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law and the federal Constitution. The Court also has jurisdiction over the FTCA claim against the United States under 28 U.S.C. § 1346(b).

9. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b)(1) & (2) because a substantial part of the events giving rise to Singh's claims occurred in this District and Singh resides in this District.

## PARTIES

10. Plaintiff Prabhjot Singh is a 27-year-old male and practicing Sikh. He is currently incarcerated at FCI Fort Dix, a federal low-security prison facility in New Jersey.

11. Defendant United States of America is a sovereign.

12. The Federal Bureau of Prisons (BOP) is a branch of the Department of Justice that operates federal prisons, including FCI Fort Dix.

13. Defendant Colette Peters is the Director of the Federal Bureau of Prisons (BOP), a branch of the Department of Justice that operates federal prisons. Peters is legally responsible for the operation of the BOP and the institutions under its jurisdiction, including FCI Fort Dix. She is sued in her official capacity.

3

14.    Defendant Rachel Thompson is the Warden of FCI Fort Dix, legally responsible for the operation of the facility and the welfare of its inmates including Singh. She is sued in her official capacity.

15.    Defendant Lt. DeJesus is a federal corrections officer employed by the BOP. DeJesus participated in the shakedown during which Singh's sacred items were desecrated. He is sued in his official and individual capacities.

16.    Defendant Lt. K. is a female federal corrections officer employed by the BOP. K. was seen carrying Singh's paint-smeared turban out of his cell following the shakedown. She is sued in his official and individual capacities.

17.    Defendant Corrections Officer (CO) Sumners is a federal corrections officer employed by the BOP. Sumners is often in charge of the distribution of food and meals inside the prison. CO Sumners is sued in his individual and official capacities. He is sued in his official and individual capacities.

18.    Defendants John Does 1 through 10 are unknown individual defendants who may be liable to Singh under one or more of the legal claims asserted below. They are sued in their official and individual capacities.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.    Singh's Sikh Faith**

19.    Singh was born in Gurdaspur, Punjab, India, to a Sikh family. He has been Sikh his whole life.

20.    As a Sikh, Singh believes in a single divine spirit that is all loving, all pervasive, and eternal.

21.    Central Sikh tenets include devotion to God, truthful living, and *seva* (worship through selfless service to humanity). Meditation, service, and justice are the cornerstones of the Sikh way of life.

22.    Singh is an "Amritdhari" (baptized) Sikh, a Sikh who has undertaken a special allegiance to the Sikh way of life, aligning with a higher promise to follow Sikh teachings and maintain Sikh articles of faith. Amritdhari Sikhs are initiated with the Choola Amrit ceremony. Once initiated, Amritdhari Sikhs must abide by the Sikh Code of Conduct, called the *Rehat Maryada*, refrain from eating meat, and perform daily prayers using a *Gutka Sahib* (a shortened version of the Sikh holy scripture, *Guru Granth Sahib*).

23.    Sikhs believe that the *Gutka Sahib* must be treated with respect and esteem and kept clean and in a high place off the ground. They remove their shoes and wash their hands before touching the *Gutka Sahib*, which they must do only with a covered head.

24.    The *Rehat Maryada* instructs that Sikhs maintain several articles of faith that together make up an external identity or uniform. This uniform unifies Sikhs, binds them to their religious beliefs, and serves as a reminder of their commitment to Sikh teachings. These articles of faith distinguish Sikhs from non-Sikhs and have deep spiritual and religious significance. They signify an individual's commitment to the Sikh faith and to the highest ideals of love and service to humanity. All Sikhs are required to maintain these articles of faith.

25.    One of the articles of faith is unshorn hair (*kesh*) covered by a holy turban. Cutting any hair weakens a Sikh's connection to God and to the Sikh religious community. Accordingly, maintaining uncut hair covered by a holy turban is an essential part of the Sikh way of life and practice of faith.

26.     Sikhs consider the turban used to cover their hair to be a precious gift from the Gurus, the founders of Sikhism. To keep them holy, turbans must always be kept clean and respected. They wash them by hand daily after use, and Sikhs wash their hands before they begin the ritual process to tie and wear the turban. Thus, for many Sikhs, it violates Sikh practice to wear a turban that was defiled at any point in time, even if it later became clean.

27.     Sikh men usually wear an undergarment beneath their turban known as a "*patka*." The *patka* is worn by Sikh children uncovered, until they learn the elaborate methods of correctly tying a turban.

28.     The turban is central to the Sikh practice of faith and serves to remind Sikh men of their duty to maintain and uphold the core beliefs of the Sikh faith.

29.     When a Sikh ties his turban, the turban ceases to be just a piece of cloth: it becomes one and the same with the Sikh's head, an extension of his body.

30.     Wearing the turban is a religious commitment so significant that a Sikh man feels he has ceased to be a Sikh when deprived of this practice. Failure to wear a turban disobeys the Sikh Gurus and their teachings.

31.     Indeed, desecrating a Sikh man's turban and forcibly cutting his hair are hallmarks of historical Sikh oppression. Such acts were central to Sikh populations' forced conversions, dating back to at least the 18th century. Since then, forcibly removing or targeting a Sikh man's turban or hair has symbolized the denial of his Sikh faith. Removing a turban and cutting a Sikh man's hair is thus perceived as the most humiliating and hurtful physical injury one can inflict upon a Sikh. Some observant Sikhs, including Singh, would prefer death before cutting their hair or having their turban removed.

32.     Unfortunately, the Sikh articles of faith engender misplaced fear and hostility in the United States. Since the 9/11 terrorist attacks, Sikhs have faced widespread discrimination and violence due to superficial similarities in their appearance (i.e., a turban and beard) to Osama bin Laden. *See* Neha Singh Gohil & Dawinder S. Sidhu, *The Sikh Turban: Post-9/11 Challenges to this Article of Faith*, 9 Rutgers J. L. & Religion 10, *1 (2008).

33.     For example, a 2009 Sikh Coalition report revealed that 41 percent of surveyed Sikhs in New York City had been called names like "Osama bin Laden" or "terrorist," and 9 percent had been physically assaulted since 9/11. *See Fact Sheet on Violence and Discrimination Against Sikhs and Other Minority Communities in New York City*, The Sikh Coalition, available at https://www.sikhcoalition.org/documents/pdf/factsheet-violence-discrimination-against-sikhs-and-minorities.pdf [https://perma.cc/J93B-BTPU].

34.     Today, Sikhs continue to encounter animus and abuse targeted at their religious exercise. For instance, mistreatment of Sikhs by federal officers resembling Singh's allegations here has been extensively documented in the immigration context. *See* E-mail from The Sikh Coalition, ACLU, and 162 Organizations to Alejandro Mayorkas (Aug. 22, 2022) at 2, https://www.sikhcoalition.org/wp-content/uploads/2022/08/Border-Officials-Religious-Rights-Violations-Sign-On-Finalized.pdf [https://perma.cc/W683-YMM7] (describing the confiscation and destruction of Sikh turbans, denial of vegetarian meals, and orders to "eat meat or starve").

**B.     Singh's Background**

35.     Singh completed high school and a computer studies course in India before coming to Canada as a student when he was 19 years old, settling in Brampton, Ontario, a suburb of Toronto.

36. Singh completed a two-year diploma in business studies at Hanson College in Brampton in 2020, after which he received a work permit and worked as a truck driver in Canada.

37. Singh was an engaged member of the Sikh community in Canada. He regularly attended his Gurudwara (house of worship) and volunteered for several *seva* (selfless service) activities with Sikh organizations, including charitable fundraising drives supporting education for children in rural communities in India.

38. In March 2022, Singh was arrested and held at Livingston County Jail in Howell, Michigan. He later pleaded guilty to a nonviolent drug possession offense and was sentenced to a federal prison term of 48 months.

39. After being held at federal prison facilities in Michigan and Oklahoma, Singh was moved to FCI Fort Dix, New Jersey, on January 7, 2023.

40. Singh is scheduled to be released no later than February 26, 2025.

41. Singh is aware of one other turban-wearing Sikh currently at FCI Fort Dix and at least one other turban-wearing Sikh inmate who was recently released.

42. At all times relevant to this complaint, Singh was housed at FCI Fort Dix. There, he shared a 12-person room with inmates of several other faiths, including Christianity, Islam, and Judaism.

43. As permitted by BOP policy and in accordance with religious accommodations that Singh was granted, Singh stored in his room three holy turbans, one *patka*, and a small print version of his *Gutka Sahib*.

44.     Singh's three holy turbans are black. Two of the turbans are around four meters long, and the third is 7.5 meters long. The longer turban carries special significance and is used for certain acts of worship. It is critical that he have two of the shorter turbans, which he wears more regularly, to allow him to wear one while the other is being washed or dried.

45.     Singh's holy turbans were purchased by his family from India. He kept them in his locker in a clearly marked bag with an approval note from FCI Fort Dix Chaplain Jenkins.

46.     Singh stored his *Gutka Sahib* in the shirt pocket of his spare, clean uniform, which he hung on a high hook in his designated locker. He did so as part of his religious practice, which dictates that the *Gutka Sahib* must be stored in a clean, elevated place.

47.     Singh has discussed his religious needs with at least three chaplains at FCI Fort Dix—Chaplain Jenkins, Chaplain Friday, and Chaplain Gates.

48.     Chaplain Jenkins administered training on the Sikh faith and its religious articles to the prison officials at FCI Fort Dix. The training taught prison officials how to identify Sikh articles and to refrain from touching those articles.

49.     The prison chaplains maintain posters on the wall of the chapel hallway with pictures describing the headgear of different faiths, including Sikh turbans. Every prison unit also displays a list of the religious articles maintained by inmates of that unit. Thus, prison officials are aware of these religiously required articles.

50.     Still, prison officials repeatedly fail to respect Sikh religious practices. For example, in May 2023, a corrections officer aggressively demanded that Singh and fellow Sikh inmates remove their turbans and relented only when another officer intervened.

**C.    The Shakedown on July 7, 2023**

51.    On July 7, 2023, at 8:40 PM, corrections officers entered Singh's shared cell, Room 220, ostensibly to conduct a shakedown.

52.    Shakedowns are searches for contraband conducted when inmates are not in their cells. Doors are closed and windows covered so inmates cannot see inside.

53.    Upon information and belief, the shakedown was conducted by Defendants CO Walker, Lt. K, and Lt. DeJesus.

54.    Before July 7, Singh had seen Lt. DeJesus several times a week, though Singh had never interacted with him. Lt. DeJesus often stared down Singh and his Sikh friends when he encountered them on the ward. Singh did not encounter Lt. DeJesus for several weeks after filing his complaint, for unknown reasons.

55.    CO Walker was familiar with Singh as his unit manager and had conducted shakedowns of Room 220 before July 7.

56.    Singh never saw Lt. K before or after July 7.

57.    When the shakedown began, Singh was upstairs in Room 320 with his friend.

58.    Singh attempted to return to Room 220 around 9:00 PM but returned to Room 320 when he saw the shakedown in progress—indicated by officers' covering of the cell's window.

59.    Around 9:25 PM, Singh returned to his cell and found it dirtier and messier than after any other shakedown. The cell—which held 12 prisoners on 6 bunk beds arranged in a row— had white paint spilled on the ground between two of the bunks.

60.    Singh immediately noticed the smeared paint and his locker open. He then went to the locker next to his bunk to check on the turbans he was keeping in the parcel bag.

10

61. When he got to his locker, he found one of his small turbans defiled on the ground, wet and dirty next to a puddle of spilled water. At the time, he was wearing the other small turban. His large turban was nowhere to be found, nor was Chaplain Jenkin's approval letter.

62. Only the small *patka* undergarment remained in the locker bag.

63. Singh also found his *Gutka Sahib* on his running shoes on the ground. They sat across the room, not inside his locker where he had left them. This placement of his holy book on dirty running shoes was another act of defilement.

64. Singh found the shirt in which he stored his *Gutka Sahib* a few feet away, still hanging up. Because his shirt pocket fit tightly around the *Gutka Sahib*, an officer must have intentionally and deliberately removed it from the shirt and tossed it onto the shoes.

65. The religious articles of Muslim and Jewish cellmates, including religious garments and prayer mats, were undisturbed.

66. Singh looked for CO Walker to ask about his missing turban. Upon seeing Singh in the hallway, and before Singh could say anything, CO Walker told him to "file BP-8 and BP-9" (official grievance forms).

67. CO Walker then addressed Room 220 and apologized for the mess the shakedown had caused, which he attributed to the Lieutenants who conducted the shakedown. He offered to provide cleaning supplies if needed.

68. Prabhjot asked CO Walker about his missing turban, and CO Walker again told Prabhjot to file BP-8 and BP-9, apologized, and said he had nothing to do with it.

69. Singh insisted that he needed his turban, so CO Walker led him to a back staircase accessible only to prison staff by key. Up the staircase, CO Walker unlocked a room used to store broken beds, ripped mattresses, and other unit garbage to be thrown out.

11

70.    Inside the storage room, Singh found his holy turban in a pile of trash, covered in boot prints and thick paint. It looked like the turban had been used as a floor rag under officers' boots.

71.    Singh took the ruined turban back to his locker to keep as evidence.

72.    Singh later learned that his cellmates had observed Lt. K. carrying his turban to the garbage room, smeared with white paint. During shakedowns, Singh's cellmates typically line the hallways to see what officers take from other cells.

73.    Though the turban appeared to have been used as a rag, Singh has never before or since seen officers clean messes. In any event, the officers still left a mess of spilled paint on the floor for Singh's cellmates to clean.

74.    To retrieve Singh's holy turban, officers had to go halfway across the room and back. They had to open his locker and take the turban out of its parcel bag where it was kept alongside an approval note and notice of its religious significance. Several bunks separated the paint and Singh's locker, each with several unsecured sheets and blankets more easily and quickly available.

75.    Singh did nothing to provoke or anger prison staff, and he has never been disciplined or received an incident report. Singh also maintains good relations with other inmates, prison staff, his family, and his attorneys.

76.    Singh thus concludes that his holy turban's destruction and the desecration of his other turban and sacred items were deliberate and motivated by religious animus.

77.    Because of the personal and religious significance of his turban, Singh immediately suffered from feelings of depression and isolation following its desecration.

78. The day after the shakedown, on July 8, Singh emailed the prison psychologist, attempting to set up an appointment to help him cope with the trauma. Singh never received a response, even after multiple follow-ups, further contributing to feelings of belittlement, powerlessness, and depression.

79. That same day, Singh also reached out to Chaplain Gates for spiritual support.

80. Chaplain Gates expressed dismay at the officers' conduct, explaining that for over three months he gave extensive training on the significance of Sikhs' turbans and the importance of not touching them. He further remarked that every unit has pictures of religious articles—including Sikh turbans—on the wall, indicating that they should not be touched or mishandled. All officers thus received notice of the religious objects in their units.

81. The same day, Singh also emailed Prison Warden Stevie Knight. On July 11, Knight replied that "[a]ll allegations of staff misconduct are taken seriously and will be thoroughly investigated." Singh received no further reply.

82. Singh has not received any relief or remedy and increasingly feels targeted by prison staff. He fears leaving his belongings unattended to attend normal prison activities, such as outdoor recreation.

83. The incident continues to burden Singh's religious exercise.

84. Possessing multiple turbans enables Sikhs to wear a clean turban while they wash and dry the most recently worn turban. After the shakedown, two of Singh's three turbans were rendered unusable: his larger turban was effectively destroyed by the paint, and his second smaller turban was desecrated when it was thrown, wet and dirty, on the ground. Singh cannot wear a turban that has been desecrated in this way, even if it is cleaned.

13

85.     Singh was left with one turban and a *patka*. When wearing his *patka*, he was subjected to insensitive questions from prison officials about why he chose to wear it.

86.     Singh had to repeatedly choose between wearing a dirty turban, or his *patka* without a turban while the turban was washed and dried, for several months. Both choices are contrary to Sikh practice.

87.     The *patka* is worn uncovered only by children who have yet to learn to tie a turban. For an adult like Singh, wearing the *patka* uncovered by a turban is humiliating and a violation of core Sikh beliefs.

88.     Singh endured having only one turban for four months, until another Sikh prisoner gifted one of his turbans to Singh upon that prisoner's departure.

89.     Singh received another replacement turban from his sister in March of 2024—bringing him back to his approved count of three turbans more than seven months after the shakedown.

90.     Neither of these replacement turbans were provided by Fort Dix officials.

91.     The incident traumatized Singh: the callous and wanton desecration of his most revered sacraments left him in a state of shock and anxiety. He describes the harmful impact on his mind as profound and lifechanging. He spends many nights in tears, fearful and uncertain of what prison staff may do.

92.     Knowing his ability to practice his faith was so fundamentally violated without consequence has forced Singh into a state of isolation, fear, and depression.

**D.      Retaliation for Complaining**

93.      On July 12—the day after Warden Knight's reply to Singh's complaint—Singh was interrogated by prison staff, including Special Investigative Services (SIS) Officers Suero and Ackerson for over three hours.

94.      When he was called to talk to prison staff, he expected to discuss the staff misconduct he'd reported and the desecration of his turbans, which Warden Knight had said would be investigated.

95.      Instead, Ackerson told Singh that he believed Singh's cellmates were using paint to hide phones in walls and interrogated him about his involvement, continually asking him how many phones they had.

96.      Singh explained he knew nothing about that and was only there to discuss what happened to his sacred religious items.

97.      Ackerson repeatedly accused Singh of lying about his lack of knowledge of the phone scheme and continued aggressively attempting to elicit a confession. Ackerson repeatedly threatened him with charges of lying to a federal officer. He also accused Singh and his fellow inmates of spilling the paint on the floor of Singh's cell.

98.      Ackerson finally did ask about the turban. Singh explained that his family sent the holy turban from India to Canada, and his sister sent it to Singh with Chaplain Gates's help.

99.      At one point, Ackerson told CO Walker to retrieve the ruined, longer turban from Singh's locker to photograph it. The officers opened the turban, photographed it, and brushed off the damage, saying it was only a little bit of paint.

15

100.    Singh felt that he and Ackerson were unable to communicate properly, perhaps because of Singh's limited English proficiency, as the officer kept repeating the same questions and getting increasingly frustrated.

101.    Ackerson locked Singh alone in a cell for 40 minutes. When Ackerson returned, he offered $25 for the destroyed turban.

102.    Singh declined, explaining the holy turban was a priceless article of his faith that could not be valued in that manner. Singh also said staff should face disciplinary action.

103.    Ackerson badgered Singh about how staff would know about his religion. Singh replied that all BOP staff at Fort Dix received training about Sikhism three months earlier from a prison official, Chaplain Gates.

104.    The SIS Officers also questioned Singh about his family, their financial status, and whether they were supporting him financially in prison.

105.    Throughout the interrogation, Singh was asked intimidating and threatening questions: Had Singh ever been to solitary confinement? Did Singh deserve a second chance after (according to Ackerson) he had lied about the phone scheme? How many disciplinary citations did Singh have?

106.    Singh has a perfect disciplinary record and has never been to solitary confinement. Ackerson threatened to put him in solitary confinement for lying about the phones.

107.    Ackerson asked if Singh would take it personally if he wrote Singh up in an incident report. He also threatened to transfer Singh to a higher-security facility, ostensibly to punish him for not informing on his cellmates for possession of contraband.

16

108. Singh believes he was asked these sorts of questions as an intimidation tactic, as other inmates were present in the office, including an orderly. The questions could give eavesdropping inmates the impression that Singh was informing on his fellow prisoners about a phone contraband scheme.

109. Singh replied to Ackerson that he didn't know anything about the phones, and Ackerson told Singh he had 24 hours to decide what to do. He then dismissed Singh, telling him to take his turban and go.

110. Singh believes Ackerson used intimidation tactics to attempt to threaten and scare Singh into withdrawing his complaint to Warden Knight, and that this was retaliation for that complaint.

111. Singh's bunkmate was also interviewed and confirmed Singh's description of the July 7 shakedown.

112. Singh spoke to Chaplain Gates about the interrogation. Gates said prison staff and Ackerson were just trying to scare him, and that Singh should file a grievance if he wanted to. He also told Singh that he could file a tort claim.

113. Singh filed a BP-8 grievance on July 14, 2023, two days after the interrogation, initiating the formal grievance process in accordance with prison procedures.

### E.    Lack of Dietary Accommodations

114. As an Amritdhari Sikh, Singh's religious practice requires him to observe significant dietary proscriptions. This includes a prohibition on consuming meat, so Singh maintains a religiously mandated vegetarian diet. Singh also cannot eat other foods with utensils or containers contaminated by contact with meat products. Singh's fellow Sikh inmates have had the same religious dietary needs.

17

115.    From a young age, Singh has also suffered from a documented sensitivity to gluten. He was prescribed a gluten-free diet in India, which he has since maintained.

116.    Singh's gluten sensitivity resembles celiac disease, which was not distinguished from other gluten sensitivities in India until recently. Punjabi populations have among the highest documented rates of celiac in the world, and Singh's counsel are attempting to secure testing for the disease. *In U.S., Celiac Disease Diagnosis Is Most Common Among Patients with Punjabi Ancestry*, American Gastroenterological Association (May 8, 2016), https://gastro.org/press-releases/in-u-s-celiac-disease-diagnosis-is-most-common-among-patients-with-punjabi-ancestry [https://perma.cc/ZS5A-U64R].

117.    During the central intake process, Dr. Patel, a BOP physician, noted Singh's sensitivity and prescribed him a gluten-free diet.

118.    Singh conveyed these requirements to prison officials upon arrival at FCI Fort Dix, including Defendant CO Sumners, who oversees the kitchen and cafeteria ("chow").

119.    The accommodation for Sikh dietary restrictions is simply receiving side dishes—that is, the normal meal trays with the meat entrees removed. Often, this means a side of salad, beans, or a peanut butter and jelly sandwich. Sikhs cannot eat any of these because they are served on a tray contaminated by contact with meat, as Sikh prisoners have repeatedly explained to staff to no avail.

120.    Even setting the contamination issue aside, serving sides with the meat removed is not an adequate accommodation. The remaining side dishes provide insufficient calories and nutrients—especially for Singh if they contain gluten.

121.    Prison staff have the resources to accommodate a gluten-free Sikh inmate, but choose not to. When sympathetic inmates are working the kitchen detail, they give Singh gluten-free bread and beans in an uncontaminated Styrofoam box. If inmates working the kitchen detail can manage this, CO Sumners and other prison staff can as well.

122.    Singh has repeatedly explained the need for meals that accommodate his religious and health needs, but these explanations have not changed the unaccommodating treatment Singh has received from prison officials.

123.    Prison staff routinely deny Singh's requests for gluten-free Sikh accommodations. Every time Singh goes to the chow hall, prison staff make him wait 10-20 minutes before serving him non-accommodating food.

124.    In one June 2023 incident, Defendant CO Sumners gave Singh beef and regular bread—the precise foods Singh must avoid—while telling him, "I am not [f***ing] making you a special meal," and saying Singh could choose between eating and his religion.

125.    In another incident in June 2023, prison staff gave Singh hummus that had expired three months earlier.

126.    On several occasions, Singh was given cereal (with gluten) and milk for dinner.

127.    During the Diwali / Bandi Chhor Divas holiday, kitchen staff told Hindu and Sikh inmates that they would prepare a festive meal so they could celebrate. However, the meals were not prepared, leading the affected inmates, including Singh, to feel forgotten by prison staff. Festive meals are prepared for holidays of other faiths.

128.    This differing standard of treatment evinces prison officials' hostility toward Sikhs, which manifests in many areas of prison life.

129. The Sikh inmates have raised their concerns with Chaplain Gates and Chaplain Friday, but adequate Sikh dietary accommodations have not been provided.

130. Singh is afraid of angering the prison staff at chow. He must either skip meals or purchase most of his food from the commissary, at his own expense. Security restrictions have further limited Singh's ability to purchase food, and he is often unable to consume sufficient nutrients or calories.

131. In addition to psychological harm, Singh has experienced substantial involuntary weight loss. Though he normally weighs around 150 pounds, his weight has dropped to 130 pounds while incarcerated at Fort Dix.

**F.      Deprivation of Medical Care**

132. Before his arrest, Singh was diagnosed with a pulmonary disease related to a fungal allergy. Singh was prescribed medication because the condition, when untreated, can lead to bronchitis.

133. Singh was taking the prescribed medications for his lungs up until his arrest.

134. When Singh arrived at FCI Fort Dix in January 2023, prison staff would not provide his medications.

135. Whenever Singh requested his prescribed medications, the nurse simply took his vitals and, noting that he had no fever, sent him back without scheduling him for a doctor's appointment. Each time, medical staff told him to purchase over-the-counter drugs at the commissary, but he was not allowed access. Singh estimates this happened ten times in three months.

136. Singh was given Prednisone on at least one occasion, but without the needed anti-fungal, rendering it ineffective.

137.    Because he was unable to obtain his medication from prison staff, Singh developed a chronic wheezing cough and congestion, which worsened over time.

138.    In February, Singh became so ill that he was hospitalized for nearly two weeks.

139.    By the time he was admitted to the hospital, he had had a high fever (measured by the hospital at 104 degrees). His fever lasted for a month.

140.    He was diagnosed with pneumonia and a "heavy growth" drug-resistant staph infection. Singh was prescribed medication and was advised to continue taking this medication over a course of weeks until his health improved.

141.    However, when Singh returned to FCI Fort Dix, prison staff only gave him two pills of an unknown medication that did not match Singh's prescription and refused requests for subsequent doses. Prison staff did not allow Singh to finish his prescribed course of treatment, without explanation.

142.    Because he was unable to access his medication, Singh's respiratory problems emerged again by mid-March.

143.    In late April, after more than two months of being denied access to his prescribed medication, Singh was examined by a pulmonologist, Dr. Seelagy, at FCI Fort Dix. Dr. Seelagy diagnosed Singh with asthma and allergic bronchopulmonary aspergillosis, a fungal infection that primarily affects those with a weakened immune system. Singh was prescribed fluticasone and voriconazole for these conditions, and Singh was advised to take both for thirty days.

144.    Once more, prison staff denied Singh access to the medications that the pulmonologist had just prescribed.

21

145.    Singh's health continued to worsen. He contacted his Michigan defense attorney Victor Mansour on May 5, 2023, who contacted the prison on May 10. After this, Singh finally received his medications, weeks after they were prescribed, following months of unnecessary illness.

146.    As a result of the prison's actions, Singh suffered substantial unintended weight loss and potentially permanent lung damage, resulting from months of withheld treatment and medication, a lengthy hospitalization, and unaccommodated dietary needs.

147.    The prison's maltreatment also caused significant harm to Singh's mental health and emotional state, exacerbated by his ongoing inability to access psychological services.

148.    Upon information and belief, other Sikh inmates have suffered similarly delayed or withheld medical treatment.  For example, another Sikh inmate, Jasminder Singh, required mouth surgery that a doctor deemed medically necessary, but he was ignored by prison staff.

149.    Also upon information and belief, non-Sikh prisoners typically have not encountered long delays when seeking treatment or medication. While there are frequently delays in satisfying the medical needs of prisoners at Fort Dix, Singh and other Sikh inmates have experienced especially dismissive treatment from prison medical staff.

150.    Sikh inmates receive worse accommodations than non-Sikh inmates in many contexts. For example, non-Sikh inmates are permitted to wear metal articles of faith like crucifixes, while Sikh prisoners are deprived of the metal bracelet (*kara*) upon detention.

151.    Prison staff frequently mock or ridicule Singh's turban without provocation. Other Sikh prisoners have also been the subject of derisive comments by prison staff making reference to their religious garb and practices. For example, a prison official mocked one Sikh prisoner for his religious clothing, calling him "f***ing Taliban" for his use of a turban.

22

152.    Singh has faced similar discriminatory comments himself. On December 5, 2023, Singh attempted to get food at the chow hall but was turned away by Compound Officer Rayal, Lt. Weaver, and a senior officer whose name is not known. Rayal said chow was closed and Singh had missed it, then Lt. Weaver shouted, "How many bananas can you carry in that?" referring to Singh's turban. All three officers laughed.

### G.    Timeline of Exhausted Administrative Remedies

153.    On July 14, 2023, Singh filed Informal Resolution Form (BP-8) with his Correctional Counselor, Mr. Lee, in accordance with prison procedure.

154.    On July 19, 2023, the Counselor gave Singh a Request for Administrative Remedy Form (BP-9), having received no response from relevant staff.

155.    On July 20, 2023, Singh filed the BP-9.

156.    On July 31, 2023, Singh received an unsatisfactory response from Acting Warden Andy Cruz. The response described Singh's allegations as "serious," and said they would "be given an appropriate amount of review and/or investigation."  However, the response indicated that no findings or results would be disclosed to Singh, due to the staff member "privacy."

157.    On August 4, 2023, Singh filed the Regional Administrative Remedy Appeal (BP-10) in accordance with prison procedure.

158.    Singh did not receive a response to his BP-10 within the 30-day statutory deadline, so he considered it denied.

159.    On October 3, 2023, Singh submitted the BP-11 Central Office Administrative Remedy Appeal, which was received by the Central Office on October 19, 2023.

160.    On November 28, 2023, the Central Office invoked a 20-day extension of the deadline to respond to the BP-11, pushing it to December 18, 2023.

161. On December 18, Singh received the BP-11 response, which was dated December 1, from Timothy Barnett, Administrator of National Inmate Appeals. The response "concur[red] with the manner in which the Warden addressed [Singh's] concerns," noted that "[s]taff conduct is governed by Program Statement 3420.11," and added that "[t]he matter has been forwarded to the appropriate Bureau component for further review." The response also noted that Singh would not be informed of any inquiry or action against staff.

162. On February 27, 2024, Prabhjot received the Regional Director Amy Boncher's response to his BP-10, dated January 22, 2024. The stated deadline to respond was October 4, 2023.

163. The response to Singh's BP-10 stated that "the Warden adequately addressed your complaint" and that a review was conducted, but "the results will not be disclosed to you because you are not entitled to this information."

164. The responses to Singh's inmate remedy forms—BP-8, BP-9, BP-10, and BP-11—are attached as Exhibit A.

165. Having exhausted the administrative remedy process without receiving any remedy or relief, Singh brings his claims in federal court.

### FIRST CLAIM FOR RELIEF
**Religious Freedom Restoration Act – 42 U.S.C. § 2000bb-1**
**Against Defendants Director Peters and Warden Thompson, in their Official Capacity, and Lt. K., Lt. DeJesus, CO Sumners, and DOES 1–10, in their Individual and Official Capacities**

166. Singh incorporates by reference all prior and subsequent paragraphs herein.

167. At all relevant times, Lt. K, Lt. DeJesus, and CO Sumners ("Defendant Officers") were BOP employees, as were DOES 1–10, Director Peters, and Warden Thompson. Because the

BOP is a federal agency, these parties were government employees subject to RFRA. *See Mack v. Loretto*, 839 F.3d 286, 302 (3d Cir. 2016).

168.    RFRA forbids employees of the federal government from imposing a substantial burden on a person's religious exercise unless they can show the action is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1; *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

### *Shakedown*

169.    Defendant Officers violated RFRA in multiple ways during their July 7 shakedown.

170.    Defendant Officers substantially burdened Singh's religious exercise by destroying and desecrating two of his three approved turbans. Sikhism mandates that turbans must be carefully and neatly stored, and, if worn, washed and changed daily to remain clean. With two of his turbans desecrated or destroyed and kept as evidence, Singh was left with only one usable turban and his *patka*. Singh was thus unable to cover his head properly while washing his turban. Singh was forced to wear his single remaining turban while it was dirty and ritually unclean, or to wash his turban and wear his *patka* uncovered—a humiliation for a Sikh adult—while his turban dried. Neither option comports with Sikh worship practices. *See Singh v. Goord*, 520 F. Supp. 2d 487, 502 (S.D.N.Y. 2007) (holding that limiting a Sikh inmate to two turbans substantially burdened his religious practice).

171.    Defendant Officers also substantially burdened Singh's religious exercise by defiling his *Gutka Sahib*, tossing it onto worn shoes on the ground. Sikhism requires daily prayer with the *Gutka Sahib* scripture, and Sikhs must treat their *Gutka Sahib* with the highest regard, only touching it with a covered head and clean hands, and storing it in a clean, elevated place, apart from shoes and undergarments. Because his *Gutka Sahib* was defiled, Singh cannot properly

perform his prayer and scripture obligations. *See id.* at 504–05 (holding that preventing storage of *Gutka Sahib* in a clean, elevated place substantially burdened Sikh inmate's religious practice).

172.   As discussed above, no compelling governmental interest could justify Defendants' actions. RFRA thus entitles Singh to appropriate relief.

### Dietary Accommodations and Medical Care

173.   Defendant CO Sumner, the official in charge of the chow hall, violated RFRA by refusing to accommodate Singh's religious dietary restrictions that prohibit consumption of meat or meat-contaminated food. *See DeHart v. Horn*, 390 F.3d 262, 264–65 (3d Cir. 2004) (reversing the district court's dismissal of a similar statutory claim for failure to accommodate a Buddhist inmate's diet).

174.   Additionally, Singh requires—and was prescribed—a gluten-free diet for medical reasons. Yet CO Sumners does not accommodate Singh's gluten-free dietary needs, even though the kitchen is stocked with beans and gluten-free bread.

175.   Given his gluten-free limitation, it is especially important that Singh's religious dietary needs are respected so he can consume sufficient nutrients and calories. Yet CO Sumners and other staff continue to serve Singh expired or gluten-containing food, or side dishes contaminated by contact with meat products.

176.   CO Sumners withholds dietary accommodations because of his hostility toward Sikh inmates.

177.   No governmental or penological interest explains why Singh and other Sikh inmates are consistently deprived of religious and medical dietary accommodations, while inmates of other faiths are provided adequate special meals.

178.    Singh also alleges DOES 1–10 have withheld Singh's medication and prevented him from receiving needed healthcare because of their hostility toward his religion. Other Sikh inmates, upon information and belief, have encountered similar disparate treatment, and Singh has no other explanation for the actions of DOES 1–10.

179.    Defendants DOES 1–10 violated RFRA by withholding Singh's medication for extended periods because of hostility toward his religion.

180.    The difficulties Singh experiences at FCI Fort Dix, including his disregarded dietary needs, delayed medical care, and defiled religious items, are all manifestations of an entrenched and systemic pattern of hostility based on Singh's minority religious beliefs. Nothing in Singh's behavior or clean disciplinary record supports any other conclusion.

181.    This pattern of discriminatory treatment hinders Singh's ability to express and practice his Sikh faith freely. He is constantly confronted with the choice between his religious worship and his physical and mental health. RFRA does not permit forcing him to this choice.

182.    This conduct did not further a compelling government interest, nor can Defendants argue that defiling Singh's sacred items or preventing him from abiding by a proper and sufficient religious diet was the least restrictive means of satisfying any purported compelling interest. *See* 42 U.S.C. § 2000bb-1(a).

183.    Singh seeks all available forms of damages from Defendants in their individual capacities, as well as all appropriate declaratory and injunctive relief against Defendants in their official capacities, including but not limited to imposing the disciplinary actions required by Program Statement 3420.11, Standards of Employee Conduct, and all legal fees and costs.

**SECOND CLAIM FOR RELIEF**
**Federal Tort Claims Act – 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**
**Against Defendant the United States**

184.    Singh incorporates by reference all prior and subsequent paragraphs herein.

185.    Singh brings this claim against Defendant United States under the FTCA, which waives the federal government's sovereign immunity for certain torts committed by its employees. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475–76 (1994) (citing 28 U.S.C. § 1346(b)). Employees of federal prisons like Fort Dix are employees of the federal government and are thus covered by the FTCA.

186.    In FTCA cases, state tort law determines the United States' liability. *See Molzof v. United States*, 502 U.S. 301, 305 (1992) (citing 28 U.S.C. §§ 1346(b), 2674)).

187.    Under New Jersey tort law, intentional infliction of emotional distress requires: "(1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe." *Witherspoon v. Rent-A-Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001) (citing *Buckley v. Trenton Savs. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988)).

188.    Defendant United States' employees knowingly and intentionally caused Singh severe emotional distress, subjecting him to an ongoing pattern of abuse and harassment because of his religion. Their tortious conduct includes deliberately smearing one of Singh's holy turbans in paint with their boots and leaving it in a pile of garbage, as well as destroying and defiling his second holy turban and sacred text, refusing to accommodate his medical and religious dietary requirements, ridiculing his turban, and withholding healthcare and medication for months, causing Singh to spend weeks hospitalized.

189.    The United States' employees' behavior was extreme and outrageous under the circumstances, especially given Singh's model behavior and lack of disciplinary history, as well as the extensive training and education employees received about Sikhism. Indeed, they intentionally destroyed and defiled his holy turban and sacred text precisely because they knew those items were highly revered and precious to Singh. *See Subbe-Hirt v. Baccigaluip*, 94 F.3d 111, 115 (3d Cir. 1996) (noting that conduct is extreme and outrageous under New Jersey law if the actor proceeds in a heartless and flagrant way in the face of knowledge that the plaintiff is peculiarly susceptible to emotional distress from the conduct in question).

190.    Those employees intentionally caused Singh to suffer severe spiritual, mental, and emotional distress, and Singh remains anxious about what Defendants might do next in retaliation.

191.    Despite multiple attempts to meet with the prison's psychologist to help deal with the trauma, Singh never received a response, leaving him feeling belittled and depressed.

192.    Defendant's actions have also caused physical harms and a lengthy hospitalization, inflicting lung damage and significant unintentional weight loss on Singh.

193.    The actions of the United States' employees constitute intentional infliction of emotional distress under New Jersey law.

194.    Accordingly, Singh seeks damages as well as legal fees and costs.

**THIRD CLAIM FOR RELIEF**
**Violation of the Eight Amendment**
**Against Defendants Lt. K, CO Sumners, and DOES 1–10, in their Individual Capacities**

195.    Singh re-alleges and incorporates by reference all preceding paragraphs herein.

196.    Upon information and belief, Sikh inmates—but not inmates of other faiths—disproportionately encounter long delays before receiving needed healthcare.

29

197.    A *Bivens* claim is a judicially created remedy that allows persons to sue federal officials in their individual capacities for damages resulting from violations of constitutional rights. *See Bivens v. Six Unknown Federal Agents,* 403 U.S. 388 (1971) (identifying a cause of action for damages for a warrantless search).

198.    The Supreme Court has recognized such claims in cases involving Eighth Amendment violations. *Carlson v. Green*, 446 U.S. 14 (1980) (holding that a *Bivens* action existed for prison officials' denial of medically necessary care to inmates); *Farmer v. Brennan*, 511 U.S. 825, 830 (1994) (recognizing an Eighth Amendment *Bivens* action where prison officials were deliberately indifferent to risk that plaintiff would be attacked by other prisoners); *see Shorter v. United States*, 12 F.4th 366, 371–73 (3d Cir. 2021) (holding that a *Bivens* remedy remains available in the Eighth Amendment context and that "*Farmer* remains good law").

199.    The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII.

200.    The Supreme Court held in *Carlson* that denial of medically necessary care to a federal inmate constituted cruel and unusual punishment. 446 U.S. at 17.

201.    In *Carlson*, federal prison officials declined to give an inmate adequate medical care for over eight hours after he suffered an asthma attack, disregarded his doctors' medical advice, and delayed his transfer to a hospital or offsite where he could access adequate care. *Id.* at 16 n.1.

202.    Successful Eighth Amendment claims for failure to provide medical care require "(1) a subjective showing that 'the defendants were deliberately indifferent to [a plaintiff's] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison*

*Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182 F. 3d 192, 197 (3d Cir. 1999)).

203.    Prison officials "act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'" *Id.* At 534 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

204.    The Eighth Amendment also imposes duties on prison officials to "ensure that inmates receive adequate food." *Shorter*, 12 F.4th at 372 (quoting *Farmer*, 511 U.S. at 832). As with medical care, prison officials can be liable under the Eighth Amendment "for denying an inmate humane conditions of confinement" if they "know[] of and disregard[] an excessive risk to inmate health of safety." *Id.* (quoting *Farmer*, 511 U.S. at 837).

205.    Singh suffered from a pulmonary disease related to a fungal allergy, requiring him to regularly take prescription medication before arrest. Without such medication, the condition can cause bronchitis.

206.    Because Defendants withheld Singh's medication, he developed a chronic wheezing cough and congestion, eventually becoming so ill that he was hospitalized for two weeks. A doctor prescribed him additional medication. However, when Singh returned to FCI Fort Dix, prison staff only gave two pills and refused requests for subsequent doses. Prison staff did not allow Singh to finish his prescribed course of treatment, without explanation.

207.    Without his medication, Singh's respiratory problems reemerged by mid-March.

208.    As in *Carlson*, this denial of adequate medical care has resulted in serious physical harm to Singh. Defendants were made aware of Singh's medical needs yet refused basic and medically required actions that could have prevented that serious harm.

209.    Defendants also violated Singh's Eighth Amendment rights by failing to "ensure that [he] receive[d] adequate food." *Shorter*, 12 F.4th at 372 (quoting *Farmer*, 511 U.S. at 832) (holding that FCI Fort Dix officials were liable under *Bivens* for violating a prisoner's Eighth Amendment rights). Defendants have disregarded Singh's repeated pleas for adequate vegetarian and gluten-free food that will allow him to maintain a calorically sufficient religious diet. Having insufficient food on a daily basis poses a substantial risk of serious harm, and indeed, has caused Singh to suffer significant weight loss as well as emotional and mental distress.

210.    Under *Bivens*, *Carlson*, and *Farmer*, Singh seeks damages.

## PRAYER FOR RELIEF

211.    Given all the preceding allegations, Singh prays the Court grant the following relief:

a.    Award Singh all appropriate monetary, declaratory, and equitable relief required to redress the violations of the law described herein, and to discourage their future occurrence;

b.    Enjoin Defendants to accommodate Singh's full use and maintenance of approved religious articles, to accommodate Singh's religious and medical dietary needs, and to provide medication and medical care to Singh in accordance with the appropriate standard of care;

c.    Enjoin Defendants to discipline those involved in the July 7 incident in accordance with Program Statement 3420.11, Standards of Employee Conduct,

d.    Declare unlawful the Defendants' discriminatory treatment of Singh and his religious articles;

e.    Award Singh reasonable attorney's fees and costs as to all defendants; and

f.    Grant such other and further relief as the Court may deem just and proper.[1]

---

[1] Singh thanks Masooma Haider, Andrew Hayes, Sukhmani Kaur, Faris Rehman, John Rider, and Marisa Sylvester for their work in preparing this Complaint as student attorneys for the Harvard Law School Religious Freedom Clinic.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, undersigned counsel for plaintiffs hereby certifies that the matter in controversy here is not the subject of any action pending in any other court, arbitration, or administrative proceeding.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Pursuant to Local Civil Rule 201.1, undersigned counsel for plaintiffs hereby certifies that this action is excluded from compulsory arbitration because it is based on an alleged violation of a right secured by the Constitution of the United States.

**ANDERSON & SHAH, LLC**
**ATTORNEYS AT LAW**
*Attorneys for Plaintiff Prabhjot Singh*

Dated: May 10, 2024                    By: /s/Roshan Shah_____
                                                ROSHAN D. SHAH, ESQ.

MARISSA ROSETTI, ESQ.*
**THE SIKH COALITION**
165 Broadway, Office 2359
New York, NY 10006

JOSHUA C. MCDANIEL, ESQ.*
PARKER W. KNIGHT, III, ESQ.*
KATIE A. MAHONEY, ESQ.*
**HARVARD LAW SCHOOL**
**RELIGIOUS FREEDOM CLINIC**
6 Everett Street
Wasserstein Hall, 5th Floor
Cambridge, MA 02138

*pro hac vice forthcoming*