ROSHAN D. SHAH, ESQ.
**SHAH LAW GROUP, LLC**
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Telephone: (732) 398-6545
Facsimile: (732) 576-0027

MARISSA ROSETTI, ESQ. (*pro hac vice forthcoming*)
**THE SIKH COALITION**
165 Broadway, Office 2359
New York, NY 10006

JOSHUA C. MCDANIEL, ESQ. (*pro hac vice forthcoming*)
PARKER W. KNIGHT III, ESQ. (*pro hac vice forthcoming*)
KATHRYN F. MAHONEY, ESQ. (*pro hac vice forthcoming*)
STEVEN W. BURNETT, ESQ. (*pro hac vice forthcoming*)
**HARVARD LAW SCHOOL**
**RELIGIOUS FREEDOM CLINIC**
6 Everett Street, Suite 5110
Cambridge, MA 02138
*Attorneys for Plaintiff Prabhjot Singh*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| PRABHJOT SINGH,<br><br>           Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF PRISONS ACTING DIRECTOR WILLIAM LOTHROP, in his official capacity; WARDEN, FCI FORT DIX, in his or her official capacity; LIEUTENANT BENJAMIN DEJESUS, in his individual and official capacities; CASE MANAGER MALGORZATA KRZEWSKA, in her individual and official capacities; FOOD SERVICES COOK FOREMAN ROBERT SUMNER, in his individual and official capacities; JOHN DOES 1-10, in their individual and official capacities,<br><br>           Defendants. | Civil Action No. 1:24-cv-06027<br><br><br>Hon. Karen M. Williams, U.S.D.J.<br>Hon. Matthew J. Skahill, U.S.M.J.<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Prabhjot Singh resides at 29606 120th Ct SE, Auburn, WA 98092. During the events giving rise to this action, Singh was incarcerated at Federal Correctional Institution (FCI) Fort Dix, 5756 Hartford St & Pointville Rd, Joint Base MDL, Fort Dix, NJ 08640. Defendant Federal Bureau of Prisons (BOP) Acting Director William Lothrop, in his official capacity, has the address of 320 First St. NW, Washington, DC 20534. Defendants *Warden, FCI Fort Dix*, Lt. Benjamin DeJesus, Case Manager (CM) Malgorzata Krzewska, and Food Services Cook Foreman (CF) Robert Sumner,[1] all have the address of FCI Fort Dix, 5756 Hartford St & Pointville Rd, Joint Base MDL, Fort Dix, NJ 08640. The identities and addresses of Defendants John Does 1–10 are unknown.

## PRELIMINARY STATEMENT

1.      This action arises from Defendants' repeated violations of Plaintiff Prabhjot Singh's religious rights. Prison officials at FCI Fort Dix routinely subjected Singh to discrimination and abuse because of his Sikh faith, without provocation and despite his perfect disciplinary record.

2.      In one egregious incident, corrections officers deliberately destroyed Singh's holy turban, first trampling it under their boots and smearing it with spilled paint, then tossing it in the trash in a restricted area. Officers also desecrated a second turban and Singh's holy book. These actions are deeply traumatizing to Sikhs like Singh.

3.      This incident was part of a broader pattern of discriminatory and abusive treatment by Defendants, who openly mocked and ridiculed Singh's religious practices.

4.      Defendants refused to properly accommodate Singh's religious and medical dietary restrictions, forcing Singh to spend $5,500 on commissary food, which often lacked sufficient nutrients.

---

[1] The original Complaint listed Lt. Benjamin DeJesus as "Lt. Robert DeJesus," CM Malgorzata Krzewska as "Lt. K.," and CF Robert Sumner as "Corrections Officer Robert Sumner." Defendants have provided their correct names and titles. *See* Am. Notice of Appearance at 1, 1 n.1, ECF No. 17.

5.      Defendants delayed Singh's medical care and withheld prescribed lung medication for months, causing Singh to spend weeks hospitalized with bronchitis. Singh was also denied mental health services, which he repeatedly sought to help cope with the trauma and distress caused by Defendants' actions.

6.      Finally, when Singh submitted a formal grievance (Remedy ID 1169270-A1), Defendant officers and other staff retaliated against him, threatening Singh with solitary confinement and transfer to a higher security prison. Defendant officers and other staff also withheld time-sensitive mail and refused to allow Singh to meet privately with his attorneys during multiple attorney visits.

7.      In the months after Singh exhausted his grievance and filed this lawsuit, Defendants stopped all accommodations for Singh's dietary needs, withheld his prescribed lung medication, and again defiled his sacred book and turban during a shakedown.

8.      This discriminatory conduct violated the religious protections Congress established in the Religious Freedom Restoration Act (RFRA) and violated Singh's Eighth Amendment right to adequate food and medical treatment. Singh seeks all available relief to hold Defendants accountable for their egregious and illegal actions.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law and the federal Constitution.

10.     Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b)(1) & (2) because a substantial part of the events giving rise to Singh's claims occurred in this District and Defendants reside in this District.

## PARTIES

11.     Plaintiff Prabhjot Singh is a 28-year-old male and practicing Sikh. He was

previously incarcerated at FCI Fort Dix, a federal low-security prison facility in New Jersey, and he was released in October 2024. Singh currently resides with a relative at 29606 120th Ct SE, Auburn, WA 98092.

12.     The Federal BOP is a branch of the Department of Justice that operates federal prisons, including FCI Fort Dix.

13.     Defendant William Lothrop is the Acting Director of the BOP. Lothrop is legally responsible for the operation of the BOP and the institutions under its jurisdiction, including FCI Fort Dix. He is sued in his official capacity.

14.     Defendant *Warden, FCI Fort Dix*, in his or her official capacity, represents the office of the warden of FCI Fort Dix, legally responsible for the operation of the facility and the welfare of its inmates.

15.     Defendant Lt. Benjamin DeJesus is a federal corrections officer employed by the BOP. DeJesus participated in the shakedown during which Singh's sacred items were desecrated. He is sued in his official and individual capacities.

16.     Defendant CM Malgorzata Krzewska is a federal case manager employed by the BOP. Krzewska was seen carrying Singh's paint-smeared turban out of his cell following the shakedown. She is sued in her official and individual capacities.

17.     Defendant CF Robert Sumner is a federal food services cook foreman employed by the BOP. Sumner is often in charge of the distribution of food and meals inside the prison—a role that included serving meals to Singh and other prisoners. He is sued in his individual and official capacities.

18.     Defendants John Does 1 through 10 are unknown individual defendants who may be liable to Singh under one or more of the legal claims asserted below. They are sued in their official and individual capacities.

4

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

   A.    **Singh's Sikh Faith**

19.    Singh was born in Gurdaspur, Punjab, India, to a Sikh family. He has been Sikh his whole life.

20.    As a Sikh, Singh believes in a single divine spirit that is all loving, all pervasive, and eternal.

21.    Central Sikh tenets include devotion to God, truthful living, and *seva* (worship through selfless service to humanity). Meditation, service, and justice are the cornerstones of the Sikh way of life.

22.    Singh is an "Amritdhari" (initiated) Sikh, a Sikh who has undertaken a special allegiance to the Sikh way of life, aligning with a higher promise to follow Sikh teachings and maintain Sikh articles of faith.

23.    Once initiated, Amritdhari Sikhs must abide by the Sikh Code of Conduct (called the *Rehat Maryada*): they are called on to refrain from eating meat and perform daily prayers using a *Gutka Sahib* (a shortened version of the Sikh scripture, *Guru Granth Sahib*).

24.    Sikhs believe that the *Gutka Sahib* must be treated with respect and esteem and kept clean and in a high place off the ground. They remove their shoes and wash their hands before touching the *Gutka Sahib*, which they must do only with a covered head.

25.    The *Rehat Maryada* instructs that Sikhs maintain five articles of faith that comprise an external identity or uniform. This uniform unifies Sikhs, binds them to their religious beliefs, and serves as a reminder of their commitment to Sikh teachings. These articles of faith distinguish Sikhs from non-Sikhs and have deep spiritual and religious significance. They signify an individual's commitment to the Sikh faith and to the highest ideals of love and service to humanity. All Amritdhari Sikhs are required to maintain these articles of faith by the *Rehat Maryada*.

26.     One of the articles of faith is unshorn hair (*kesh*) covered by a holy turban. Cutting any hair weakens a Sikh's connection to God and to the Sikh religious community. Accordingly, maintaining uncut hair covered by a holy turban is an essential part of the Sikh way of life and practice of faith.

27.     Sikhs consider the turban used to cover their hair to be a precious gift from the Gurus, the founders of Sikhism ("Sikhi"). To keep them holy, turbans must always be kept clean and respected. Sikhs wash them by hand daily after use, and Sikhs wash their hands before they begin the ritual process to tie and wear the turban. Thus, for many Sikhs, it violates Sikh practice to wear a turban that was defiled at any point in time, even if it later became clean.

28.     Sikh men usually wear an undergarment beneath their turban known as a "*patka*." The *patka* is worn by Sikh children uncovered, until they learn the elaborate methods of correctly tying a turban.

29.     The turban is central to the Sikh practice of faith and serves to remind Sikh men of their duty to maintain and uphold the core beliefs of the Sikh faith.

30.     When a Sikh ties his turban, the turban ceases to be just a piece of cloth: it becomes one and the same with the Sikh's head, an extension of his body.

31.     Wearing the turban is a religious commitment so significant that a Sikh man feels he has ceased to be a Sikh when deprived of this practice. Failure to wear a turban disobeys the Sikh Gurus and their teachings.

32.     Indeed, desecrating a Sikh man's turban and forcibly cutting his hair are hallmarks of historical Sikh oppression. Such acts were central to Sikh populations' forced conversions, dating back to at least the 18th century. Since then, forcibly removing or targeting a Sikh man's turban or hair has symbolized the denial of his Sikh faith. Removing a turban and cutting a Sikh man's hair is thus perceived as the most humiliating and hurtful physical injury one can inflict

6

upon a Sikh. Some observant Sikhs, including Singh, would prefer death before cutting their hair or having their turban removed.

33. Unfortunately, the Sikh articles of faith engender misplaced fear and hostility in the United States. Since the 9/11 terrorist attacks, Sikhs have faced widespread discrimination and violence due to superficial similarities in their appearance (i.e., a turban and beard) to Osama bin Laden. *See* Neha Singh Gohil & Dawinder S. Sidhu, *The Sikh Turban: Post-9/11 Challenges to this Article of Faith*, 9 Rutgers J. L. & Religion 10, *1 (2008).

34. For example, a 2009 Sikh Coalition report revealed that 41 percent of surveyed Sikhs in New York City had been called names like "Osama bin Laden" or "terrorist," and 9 percent had been physically assaulted since 9/11. *See Fact Sheet on Violence and Discrimination Against Sikhs and Other Minority Communities in New York City*, The Sikh Coalition, available at https://www.sikhcoalition.org/documents/pdf/factsheet-violence-discrimination-against-sikhs-and-minorities.pdf [https://perma.cc/J93B-BTPU].

35. Today, Sikhs continue to encounter animus and abuse targeted at their religious exercise. For instance, mistreatment of Sikhs by federal officers, resembling Singh's allegations here, has been extensively documented in the immigration context. *See* E-mail from The Sikh Coalition, ACLU, and 162 Organizations to Alejandro Mayorkas (Aug. 22, 2022) at 2, https://www.sikhcoalition.org/wp-content/uploads/2022/08/Border-Officials-Religious-Rights-Violations-Sign-On-Finalized.pdf [https://perma.cc/W683-YMM7] (describing the confiscation and destruction of Sikh turbans, denial of vegetarian meals, and orders to "eat meat or starve").

**B. Singh's Background**

36. Singh completed high school and a computer studies course in India before coming to Canada as a student when he was 19 years old, settling in Brampton, Ontario, a suburb of Toronto.

37. Singh completed a two-year diploma in business studies at Hanson College in Brampton in 2020, after which he received a work permit and worked as a truck driver in Canada.

38. Singh was an engaged member of the Sikh community in Canada. He regularly attended his *Gurdwara* (house of worship) and volunteered for several *seva* (selfless service) activities with Sikh organizations, including charitable fundraising drives supporting education for children in rural communities in India.

39. In March 2022, Singh was arrested and held at Livingston County Jail in Howell, Michigan. He later pleaded guilty to a nonviolent drug possession offense and was sentenced to a federal prison term of 48 months.

40. After being held at federal prison facilities in Michigan and Oklahoma, Singh was moved to FCI Fort Dix, New Jersey, on January 7, 2023.

41. At FCI Fort Dix, Singh shared a 12-person room with inmates of several other faiths, including Christianity, Islam, and Judaism.

42. As permitted by BOP policy and in accordance with religious accommodations that Singh was granted, Singh stored in his room three turbans, one *patka* (Sikh headgear worn as an under-turban), and a small print version of his *Gutka Sahib*.

43. Singh's three turbans were black. Two of the turbans were around four meters long and for regular use, while the third was 7.5 meters long and for special acts of worship. It was critical that Singh had two shorter turbans, so he could wear one while washing the other.

44. Singh's turbans were purchased by his family from India. He kept them in his locker in a clearly marked bag with an approval note from FCI Fort Dix Chaplain Jenkins.

45. Singh stored his *Gutka Sahib* in the shirt pocket of his spare, clean uniform, which he hung on a high hook in his designated locker. He did so as part of his religious practice, which dictates that the *Gutka Sahib* must be stored in a clean, elevated place.

46.     Singh discussed his religious needs with at least three chaplains at FCI Fort Dix—Chaplain Jenkins, Chaplain Friday, and Chaplain Gates.

47.     Chaplain Jenkins administered training on the Sikh faith and its religious articles to the prison officials at FCI Fort Dix. The training taught prison officials how to identify Sikh articles and to refrain from touching those articles.

48.     The prison chaplains maintain posters on the wall of the chapel hallway with pictures describing the headgear of different faiths, including Sikh turbans. Every prison unit also displays a list of the religious articles maintained by inmates of that unit. Thus, prison officials were aware of these religiously required articles.

49.     Still, prison officials repeatedly failed to respect Sikh religious practices. For example, in May 2023, a corrections officer aggressively demanded that Singh and fellow Sikh inmates remove their turbans and relented only when another officer intervened.

50.     In many contexts, Sikh inmates received worse accommodations than non-Sikh inmates. For example, non-Sikh inmates were permitted to wear metal religious symbols like crosses, while Sikh prisoners were deprived of the metal bracelet (*kara*) article of faith upon detention.

51.     Prison staff frequently subjected Sikh prisoners to derisive comments, and mocked and ridiculed their turbans without provocation. For example, a prison official called one Sikh prisoner "f***ing Taliban" for his use of a turban.

52.     Singh faced similar discriminatory conduct. For example, on December 5, 2023, Singh attempted to get food at the "chow" hall (kitchen and cafeteria) but was turned away by CO Rayal, Lt. Weaver, and an unknown senior officer. Rayal told Singh chow was closed and he missed it, then Lt. Weaver shouted, "How many bananas can you carry in that [turban]?" referring to Singh's turban. All three officers laughed.

C.      **The Shakedown on July 7, 2023**

53.      On July 7, 2023, at 8:40 PM, corrections officers entered Singh's shared cell, Room 220, ostensibly to conduct a shakedown.

54.      Shakedowns are searches for contraband conducted when inmates are not in their cells. Doors are closed and windows covered so inmates cannot see inside.

55.      Upon information and belief, the shakedown was conducted by Singh's unit manager CO Walker, and Defendants CM Krzewska and Lt. DeJesus.

56.      Before July 7, Singh had seen Lt. DeJesus several times a week, though Singh had never interacted with him. Lt. DeJesus often stared down Singh and his Sikh friends when he encountered them on the ward. Singh did not encounter Lt. DeJesus for several weeks after filing his complaint, for unknown reasons.

57.      CO Walker was familiar with Singh as his unit manager and had conducted shakedowns of Room 220 before July 7.

58.      Singh never saw CM Krzewska before or after July 7.

59.      When the shakedown began, Singh was upstairs in Room 320 with his friend.

60.      Singh attempted to return to Room 220 around 9:00 PM but returned to Room 320 when he saw the shakedown in progress—indicated by officers' covering of the cell's window.

61.      Around 9:25 PM, Singh returned to his cell and found it dirtier and messier than after any other shakedown. The cell—which held 12 prisoners on 6 bunk beds arranged in a row— had white paint spilled on the ground between two of the bunks.

62.      Singh immediately noticed the smeared paint and his opened locker. He then went to the locker next to his bunk to check on the turbans he was keeping in the parcel bag.

63.      When he got to his locker, he found one of his small turbans defiled on the ground, wet and dirty next to a puddle of spilled water. At the time, he was wearing the other small turban.

10

His large turban was nowhere to be found, nor was Chaplain Jenkins' approval letter.

64. Only the small *patka* remained in the locker bag.

65. Singh also found his *Gutka Sahib* on his running shoes on the ground. They sat across the room, not inside his locker where he had left them. This placement of his sacred book on dirty running shoes was another act of defilement.

66. Singh found the shirt in which he stored his *Gutka Sahib* a few feet away, still hanging up. Because his shirt pocket had fit tightly around the *Gutka Sahib*, an officer must have intentionally and deliberately removed it from the shirt and tossed it onto the shoes.

67. The religious articles of Muslim and Jewish cellmates, including religious garments and prayer mats, were undisturbed.

68. Singh looked for CO Walker to ask about his missing turban. Upon seeing Singh in the hallway, and before Singh could say anything, CO Walker told him to "file BP-8 and BP-9" (official grievance forms).

69. CO Walker then addressed Room 220 and apologized for the mess the shakedown had caused, which he attributed to the Lieutenants who conducted the shakedown. He offered to provide cleaning supplies if needed.

70. Singh asked CO Walker about his missing turban, and CO Walker again told Prabhjot to file BP-8 and BP-9, apologized, and said he had nothing to do with it.

71. Singh insisted that he needed his turban, so CO Walker led him to a back staircase accessible only to prison staff by key. Up the staircase, CO Walker unlocked a room used to store broken beds, ripped mattresses, and other unit garbage to be thrown out.

72. Inside the storage room, Singh found his holy turban in a pile of trash, covered in boot prints and thick paint. The turban looked like it was used as a floor rag under officers' boots.

73. Singh took the ruined turban back to his locker to keep as evidence.

11

74. Singh later learned that his cellmates had observed CM Krzewska carrying his turban to the garbage room, smeared with white paint. During shakedowns, Singh's cellmates typically lined the hallways to see what officers took from other cells.

75. Though the turban appeared to have been used as a rag, Singh had never before or since seen officers clean messes. In any event, the officers still left a mess of spilled paint on the floor for Singh's cellmates to clean.

76. To retrieve Singh's holy turban during the shakedown, officers had to go halfway across the room and back. They had to open his locker and take the turban out of its parcel bag where it was kept alongside an approval note and notice of its religious significance. Several bunks separated the paint and Singh's locker, each with several unsecured sheets and blankets which were more easily and quickly available.

77. Singh did nothing to provoke or anger prison staff, and he had never been disciplined nor had he ever received an incident report. Singh also maintained good relations with other inmates, prison staff, his family, and his attorneys.

78. Singh thus concludes that his large turban's destruction and the desecration of his smaller turban and sacred items were deliberate and motivated by religious animus.

79. Because of the personal and religious significance of the turban, Singh immediately suffered from feelings of depression and isolation following these events.

80. The day after the shakedown, on July 8, Singh emailed the prison psychologist, attempting to set up an appointment to help him cope with the trauma. Singh never received a response, even after multiple follow-ups, further contributing to feelings of belittlement, powerlessness, and depression.

81. That same day, Singh also reached out to Chaplain Gates for spiritual support.

82. Chaplain Gates expressed dismay at the officers' conduct, explaining that for over

12

three months he gave extensive training on the significance of Sikhs' turbans and the importance of not touching them. He further remarked that every unit has pictures of religious articles—including Sikh turbans—on the wall, indicating that they should not be touched or mishandled. All officers thus received notice of the religious objects in their units.

83.     The same day, Singh also emailed then-Warden Stevie Knight. On July 11, Knight replied that "[a]ll allegations of staff misconduct are taken seriously and will be thoroughly investigated." Singh received no further reply.

84.     The unremedied incident continued to burden Singh's religious exercise, and he increasingly felt targeted by prison staff. He feared leaving his belongings unattended to attend normal prison activities, such as outdoor recreation.

85.     Possessing multiple turbans enables Sikhs to wear a clean turban while they wash and dry the most recently worn turban. After the shakedown, two of Singh's three turbans were rendered unusable: his larger turban was effectively destroyed by the paint, and his second smaller turban was desecrated when it was thrown, wet and dirty, on the ground. Singh cannot wear a turban that has been desecrated in this way, even if it is cleaned.

86.     Singh was left with one turban and a *patka*. For months, he was forced to choose between wearing a dirty turban or wearing his uncovered *patka* while washing and drying his turban. Both options are contrary to Singh's faith.

87.     The *patka* is worn uncovered only by children who have yet to learn to tie a turban. For an adult like Singh, wearing the *patka* uncovered by a turban is humiliating and a violation of his core religious beliefs.

88.     When wearing his *patka*, Singh was also subjected to insensitive questions from prison officials about why he chose to wear it.

89.     Singh endured having only one turban for four months, until another Sikh prisoner

13

gifted one of his turbans to Singh upon that prisoner's departure.

90.    Singh received another replacement turban from his sister in March of 2024—bringing him back to the approved three turbans more than seven months after the shakedown.

91.    Neither of Singh's replacement turbans were provided by Fort Dix officials.

92.    The incident traumatized Singh: the callous and wanton desecration of his most revered articles of faith left him in a state of shock and anxiety. Knowing his ability to practice his faith could be so fundamentally violated without consequence forced Singh into a state of isolation, fear, and depression.

93.    Singh described the harmful impact on his mind as profound and life-changing. He spent many nights in tears, fearful and uncertain of what prison staff may do.

**D.    Retaliation for Complaining**

94.    On July 12—the day after then-Warden Knight's reply to Singh's complaint—Singh was interrogated by prison staff, including Special Investigative Services (SIS) Officers Suero and Ackerson for over three hours.

95.    Singh had expected to discuss the staff misconduct he'd reported and the desecration of his turbans, which Warden Knight said would be investigated.

96.    Instead, Ackerson told Singh that he believed Singh's cellmates were using paint to hide phones in walls and interrogated him about his involvement, continually asking him how many phones they had.

97.    Singh explained he knew nothing about that and was only there to discuss what happened to his sacred religious items and article of faith.

98.    Ackerson repeatedly accused Singh of lying about his lack of knowledge of the phone scheme and continued aggressively attempting to elicit a confession. Ackerson repeatedly threatened him with charges of lying to a federal officer. He also accused Singh and his fellow

14

inmates of spilling the paint on the floor of Singh's cell.

99.     Ackerson finally did ask about the turban. Singh explained that his family sent the turban from India to Canada, and his sister sent it to Singh with Chaplain Gates's help.

100.     At one point, Ackerson told CO Walker to retrieve the ruined, longer turban from Singh's locker to photograph it. The officers opened the turban, photographed it, and brushed off the damage, saying it was only a little bit of paint.

101.     Singh felt that he and Ackerson were unable to communicate properly, perhaps because of Singh's limited English proficiency, as the officer kept repeating the same questions and getting increasingly frustrated.

102.     Ackerson locked Singh alone in a cell for 40 minutes. When Ackerson returned, he offered $25 for the destroyed turban.

103.     Singh declined, explaining the holy turban was a priceless article of his faith that could not be valued in that manner. Singh also said staff should face disciplinary action.

104.     Ackerson badgered Singh about how staff would know about his religion. Singh replied that all BOP staff at Fort Dix received training about Sikhi three months earlier from a prison official, Chaplain Gates.

105.     The SIS Officers also questioned Singh about his family, their financial status, and whether they were supporting him financially in prison.

106.     Throughout the interrogation, Singh was asked intimidating and threatening questions: Had Singh ever been to solitary confinement? Did Singh deserve a second chance after (according to Ackerson) he had lied about the phone scheme? How many disciplinary citations did Singh have?

107.     Singh had a perfect disciplinary record and had never been to solitary confinement. Ackerson threatened to put him in solitary confinement for lying about the phones.

108.    Ackerson asked if Singh would take it personally if he wrote Singh up in an incident report. He also threatened to transfer Singh to a higher-security facility, ostensibly to punish him for not informing on his cellmates for possession of contraband.

109.    Singh believes he was asked these sorts of questions as an intimidation tactic, as other inmates were present in the office, including an orderly. The questions could have given eavesdropping inmates the impression that Singh was informing on his fellow prisoners about a phone contraband scheme.

110.    Singh replied to Ackerson that he didn't know anything about the phones, and Ackerson told Singh he had 24 hours to decide what to do. He then dismissed Singh, telling him to take his turban and go.

111.    Singh believes Ackerson used intimidation tactics to attempt to threaten and scare Singh into withdrawing his complaint to then-Warden Knight, and that this was retaliation for that complaint.

112.    Singh's bunkmate was also interviewed and confirmed Singh's description of the July 7 shakedown.

113.    Singh spoke to Chaplain Gates about the interrogation. Gates said prison staff and Ackerson were just trying to scare him, and that Singh should file a grievance if he wanted to. He also told Singh that he could file a tort claim.

114.    Singh filed a BP-8 grievance on July 14, 2023, two days after the interrogation, initiating the formal grievance process.

### E.    Lack of Dietary Accommodations

115.    As an Amritdhari Sikh, Singh observes significant dietary proscriptions. This includes a prohibition on consuming meat, so Singh maintains a strict and religiously mandated vegetarian diet. Singh also cannot eat other foods with utensils or containers contaminated by

16

contact with meat products. Singh's fellow Sikh inmates have had the same religious dietary needs.

116.    From a young age, Singh has also suffered from a documented sensitivity to gluten. He was prescribed a gluten-free diet in India, which he has since maintained.

117.    Singh's gluten sensitivity resembles celiac disease, which was not distinguished from other gluten sensitivities in India until recently. Punjabi populations have among the highest documented rates of celiac in the world, and Singh's counsel are attempting to secure testing for the disease. *In U.S., Celiac Disease Diagnosis Is Most Common Among Patients with Punjabi Ancestry*, American Gastroenterological Association (May 8, 2016), https://gastro.org/press-releases/in-u-s-celiac-disease-diagnosis-is-most-common-among-patients-with-punjabi-ancestry [https://perma.cc/ZS5A-U64R].

118.    During the central intake process, Dr. Patel, a BOP physician, noted Singh's sensitivity and prescribed him a gluten-free diet.

119.    Singh conveyed these dietary needs to prison staff upon arrival at FCI Fort Dix, including Defendant CF Sumner, who oversees the kitchen and cafeteria ("chow").

120.    Prison staff accommodated Sikh diets by providing Sikhs only with side dishes—that is, the normal meal trays with the meat entrees removed. Often, this meant a side of salad, beans, or a peanut butter and jelly sandwich. But Sikhs couldn't eat these since they were served on a tray contaminated by meat contact, as Sikh prisoners repeatedly explained to staff to no avail.

121.    Muslim and Jewish inmates are provided separately packaged meals that are halal and kosher, but this accommodation is not extended to Sikhs.

122.    Even setting the contamination issue aside, serving sides with the meat entrees removed was not an adequate accommodation. The side dishes provided insufficient calories and nutrients—especially for Singh if they contained gluten.

123.    Prison staff had the resources to accommodate a gluten-free Sikh inmate, but chose

17

not to. Sympathetic inmates working the kitchen detail gave Singh gluten-free bread and beans in uncontaminated Styrofoam boxes. If inmates working the kitchen detail could manage this, CF Sumner and other prison staff could have as well.

124.    Singh repeatedly explained the need for meals that accommodate his religious and health needs, but these requests were routinely denied. When Singh went to the chow hall, prison staff typically made him wait 10-20 minutes before serving him non-accommodating food.

125.    In one June 2023 incident, Defendant CF Sumner gave Singh beef and regular bread—the precise foods Singh must avoid—while telling him, "I am not [f***ing] making you a special meal," and saying Singh could choose between eating and his religion.

126.    In another incident in June 2023, prison staff gave Singh hummus that had expired three months earlier.

127.    On several occasions, Singh was given cereal (with gluten) and milk for dinner.

128.    During the Diwali / Bandi Chhor Divas holiday, kitchen staff told Hindu and Sikh inmates that they would prepare a festive meal so they could celebrate. However, the meals were not prepared, leading the affected inmates, including Singh, to feel forgotten by prison staff.

129.    Festive meals were prepared for other faiths' holidays, and the differing treatment evinced prison officials' hostility toward Sikhs, which manifested in many areas of prison life.

130.    Sikh inmates raised their concerns with Chaplain Gates and Chaplain Friday, but adequate Sikh dietary accommodations were not provided.

131.    Afraid of angering staff, Singh was forced to skip meals or purchase food from the commissary, at his own expense—around $5,500 total during his incarceration.

132.    Security restrictions often limited Singh's ability to purchase food, preventing him from consuming sufficient nutrients or calories.

133.    In addition to psychological harm, Defendants' conduct caused Singh to suffer

18

substantial involuntary weight loss. At one point, Singh's weight fell to 130 pounds from his normal 150 pounds.

134. The targeted denial of Sikh dietary accommodations is the subject of multiple lawsuits against FCI Fort Dix staff. *See* Memorandum Opinion, *Jasminder Singh v. Thompson, et al.*, No. 24-7641 (RMB-EAP), at *4–7 (D.N.J. Nov. 18, 2024) (permitting Sikh plaintiff's RFRA claim against FCI Fort Dix employee for denial of his religious diet to proceed past *pro se* screening stage pursuant to 28 U.S.C. § 1915(e)(2)(B)).

### F.   Deprivation of Medical Care

135. Before his arrest, Singh was diagnosed with a pulmonary disease related to a fungal allergy. Singh was prescribed medications because the condition, when untreated, can lead to bronchitis.

136. Singh was taking the prescribed medications for his lungs up until his arrest.

137. When Singh arrived at FCI Fort Dix in January 2023, prison staff would not provide his medications.

138. Whenever Singh requested his prescribed medications, the nurse simply took his vitals and, noting that he had no fever, sent him back without scheduling him for a doctor's appointment. Each time, medical staff told him to purchase over-the-counter drugs at the commissary, but he was not allowed access. Singh estimates this happened ten times in three months.

139. Singh was given Prednisone on at least one occasion, but without the needed anti-fungal, rendering it ineffective.

140. Because he was unable to obtain his medication from prison staff, Singh developed a chronic wheezing cough and congestion, which worsened over time.

141. In February, Singh became so ill that he was hospitalized for nearly two weeks.

19

142. By the time he was admitted to the hospital, he had had a high fever (measured by the hospital at 104 degrees). His fever lasted for a month.

143. He was diagnosed with pneumonia and a "heavy growth" drug-resistant staph infection. Singh was prescribed medication and was advised to continue taking this medication over a course of weeks until his health improved.

144. However, when Singh returned to FCI Fort Dix, prison staff only gave him two pills of an unknown medication that did not match Singh's prescription and refused requests for subsequent doses. Prison staff did not allow Singh to finish his prescribed course of treatment, without explanation.

145. Because he was unable to access his medication, Singh's respiratory problems emerged again by mid-March 2023.

146. In late April 2023, after more than two months of being denied access to his prescribed medication, Singh was examined by a pulmonologist, Dr. Seelagy, at FCI Fort Dix. Dr. Seelagy diagnosed Singh with asthma and allergic bronchopulmonary aspergillosis, a fungal infection that primarily affects those with a weakened immune system. Singh was prescribed fluticasone (a corticosteroid) and voriconazole 200mg (an anti-fungal) for these conditions, and Singh was advised to take both for thirty days.

147. Once more, prison staff denied Singh access to the medications that the pulmonologist had just prescribed.

148. Singh's health continued to worsen. He contacted his Michigan defense attorney Victor Mansour on May 5, 2023, who contacted the prison on May 10. After this, Singh finally received his medications, weeks after they were prescribed, following months of unnecessary illness.

149. Upon information and belief, other Sikh inmates have suffered similarly delayed or

20

withheld medical treatment.  For example, another Sikh inmate, Jasminder Singh, required mouth surgery that a doctor deemed medically necessary, but he was ignored by prison staff.

150.    As a result of the prison's actions, Singh suffered substantial unintended weight loss and potentially permanent lung damage, resulting from months of withheld treatment and medication, a lengthy hospitalization, and unaccommodated dietary needs.

151.    The prison's maltreatment also caused significant harm to Singh's mental health and emotional state, exacerbated by his ongoing inability to access psychological services.

152.    Also upon information and belief, non-Sikh prisoners typically have not encountered long delays when seeking treatment or medication. While there are frequently delays in satisfying the medical needs of prisoners at Fort Dix, Singh and other Sikh inmates experienced especially dismissive treatment from prison medical staff.

### G.    Timeline of Exhausted Administrative Remedies

153.    On July 14, 2023, Singh filed Informal Resolution Form (BP-8) with his Correctional Counselor, Mr. Lee, in accordance with prison procedure.

154.    On July 19, 2023, the Counselor gave Singh a Request for Administrative Remedy Form (BP-9), having received no response from relevant staff.

155.    On July 20, 2023, Singh filed the BP-9 form.

156.    On July 31, 2023, Singh received an unsatisfactory response from Acting Warden Andy Cruz. The response described Singh's allegations as "serious," and said they would "be given an appropriate amount of review and/or investigation."  However, the response indicated that no findings or results would be disclosed to Singh, due to the staff member's "privacy."

157.    On August 4, 2023, Singh filed the Regional Administrative Remedy Appeal (BP-10) in accordance with prison procedure.

158.    Singh did not receive a response to his BP-10 within the 30-day statutory deadline,

so he considered it denied.

159.    On October 3, 2023, Singh submitted the BP-11 Central Office Administrative Remedy Appeal, which was received by the Central Office on October 19, 2023.

160.    On November 28, 2023, the Central Office invoked a 20-day extension of the deadline to respond to the BP-11, pushing it to December 18, 2023.

161.    On December 18, Singh received the BP-11 response, which was dated December 1, from Timothy Barnett, Administrator of National Inmate Appeals. The response "concur[red] with the manner in which the Warden addressed [Singh's] concerns," noted that "[s]taff conduct is governed by Program Statement 3420.11," and added that "[t]he matter has been forwarded to the appropriate Bureau component for further review." The response also noted that Singh would not be informed of any inquiry or action against staff.

162.    On February 27, 2024, Singh received the Regional Director Amy Boncher's response to his BP-10, dated January 22, 2024. The stated deadline to respond was October 4, 2023.

163.    The response to Singh's BP-10 stated that "the Warden adequately addressed your complaint" and that a review was conducted, but "the results will not be disclosed to you because you are not entitled to this information."

164.    The responses to Singh's inmate remedy forms—BP-8, BP-9, BP-10, and BP-11—are attached as Exhibit A.

165.    Having exhausted the administrative remedy process without receiving any remedy or relief, Singh brought his claims in federal court.

### H.    Subsequent Events

#### i.    Dietary

166.    In July 2024, Fort Dix completely stopped accommodating Singh's dietary needs,

22

and he was given only Styrofoam containing items he could not eat, such as tuna or non-gluten-free bread. Singh couldn't obtain sufficient calories and nutrients, and the kitchen supervisor acknowledged the multi-week decline in accommodations but took no corrective action.

167. Dr. Pradip Patel, Singh's doctor at Fort Dix, recognized Singh's weight loss and told Singh about the negative health consequences that can result from such malnutrition.

168. Singh raised his lack of dietary accommodations with the warden, but the deprivations continued until Singh's attorneys raised the issue with Defendants' counsel shortly before his release in late October 2024.

169. Singh believes this decline in accommodations was Fort Dix employees retaliating against him for pursuing litigation as well as discriminating against him for his religious beliefs.

### ii.    Medical

170. Singh was again prescribed voriconazole 200mg on or about September 26, 2023, and again on or about December 29, 2023.

171. For unknown reasons, the medication was withheld beginning in April 2024.

172. On August 18, 2024, Singh reported to the attending physician that he was experiencing coughing and shortness of breath again. The physician prescribed voriconazole 200mg once more on or around August 27, 2024.

173. Singh was briefly provided the medication in September 2024, but it was again withheld for unknown reasons starting October 5, 2024.

### iii.    Another Shakedown Incident

174. On August 3, 2024, at roughly 6:30 PM, on information and belief, CO Jenkins,[2] CO Roeland, and Lt. K. Case entered Singh's new shared cell, room 247, to conduct a shakedown.

---

[2] The CO Jenkins implicated in this shakedown incident is a different individual from Chaplain Jenkins.

175. Singh was elsewhere, and returned to find the cell in disarray. Many of his belongings had been thrown onto the floor far from his bunk, including his *Gutka Sahib* and turban.

176. As with the previous shakedown incident, because he had left his *Gutka Sahib* in the tight, elevated pocket of his hanging shirt, an officer must have intentionally and deliberately removed it from the shirt and tossed it onto the ground.

177. Singh's turban was likewise stored securely inside a package in a chaplain-approved box in his locker, clearly marked to only be opened in front of the chaplain or Singh. It must have been deliberately removed and tossed on the ground.

178. This occurred about thirteen months after the first shakedown incident, for which Singh had exhausted administrative remedies without receiving any real relief.

179. Singh described the incident in an August 3, 2024 email to then-Warden Rachel Thompson, noting that acts against his Sikh faith have increased in frequency and gravity during his incarceration. Singh added that "[m]y faith and I are one. The use of my [h]oly turban as nothing more than something to be thrown [o]n the floor damages my soul as a Sikh."

### iv. *Release*

180. Singh was released from FCI Fort Dix on or around October 29, 2024, and transferred to the Elizabeth Contract Detention Facility under the custody of U.S. Immigration and Customs Enforcement (ICE).

181. Approximately two days later, Singh was transferred to the Plymouth County Correctional Facility. On or around December 3, 2024, Singh was then moved to the ICE Boston Field Office in Burlington, Massachusetts, and released from ICE custody on that date.

182. After his release from ICE, Singh now resides in the state of Washington with his cousin while on parole. He has a pending U.S. asylum claim and work authorization.

183.    Pending approval of his work authorization, Singh intends to gain a commercial driver's license and resume working as a truck driver, potentially for his cousin's company.

### v.    Limited Client Access

184.    Singh's attorneys were not permitted to conduct legal visits or calls without weeks-long delays, and were frequently unable to hold private discussions with their client without being monitored by Defendants.

185.    For example, when Singh's attorneys tried to schedule a confidential legal phone call with Singh on August 30, 2024, they were told that the earliest potential date was on September 19, 2024, three weeks later.

186.    Singh's attorneys were only permitted to conduct legal visits during the regular visitation schedule—just three days (Saturday, Sunday, and Monday) out of every two weeks. The previously weekly visitation schedule was "temporarily" reduced to every other week on June 10, 2024. These restrictions violate federal regulations stating "[t]he Warden generally may not limit the frequency of attorney visits . . . ." 28 C.F.R. § 543.13(b).

187.    For example, Singh's attorneys contacted correctional officer Anthony Downs on October 2, 2024, to schedule an urgent attorney visit on Friday, October 11th, 2024, and were told the date was not available for a visit. Instead, the BOP said Singh's attorneys could only visit on October 19–21, or November 2–4, the dates for regular visitation.

188.    When in-person legal visits occurred, Singh's attorneys were given spaces where staff or other inmates could overhear, significantly hindering effective case preparation and again violating federal regulations. See 28 C.F.R. § 543.13(e) ("Staff may not subject visits between an attorney and an inmate to auditory supervision."). A sign outside the makeshift room provided indicated that the room was subject to surveillance, monitoring and recording.

189.     Singh's attorneys encountered these limitations despite contacting prison officials weeks in advance to schedule legal visits in private conference rooms. These delays obstructed basic functions of Singh's counsel, particularly given the complex procedural and legal issues involved.

### FIRST CLAIM FOR RELIEF
**Religious Freedom Restoration Act – 42 U.S.C. § 2000bb-1**
**Against Acting Director Lothrop and *Warden, FCI Fort Dix*, in their Official Capacities, and Lt. DeJesus, CM Krzewska, CF Sumner, and DOES 1–10, in their Individual and Official Capacities**

190.     Singh incorporates by reference all prior and subsequent paragraphs herein.

191.     At all relevant times, Lt. DeJesus, CM Krzewska, and CF Sumner ("Defendant Officers") were BOP employees, as were DOES 1–10, then-Director Peters, and then-Warden Thompson. Because the BOP is a federal agency, these parties were government employees subject to RFRA. *See Mack v. Loretto*, 839 F.3d 286, 302 (3d Cir. 2016).

192.     RFRA forbids employees of the federal government from imposing a substantial burden on a person's religious exercise unless they can show the action is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1; *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

***Shakedowns***

193.     Defendant Officers violated RFRA in multiple ways during their July 7, 2023 shakedown.

194.     Defendant Officers substantially burdened Singh's religious exercise by destroying and desecrating two of his three approved turbans. Sikhi mandates that turbans must be carefully and neatly stored, and, if worn, washed and changed daily to remain clean. With two of his turbans desecrated or destroyed and kept as evidence, Singh was left with only one usable turban and his *patka*. Singh was thus unable to cover his head properly while washing his turban. Singh was forced to wear his single remaining turban while it was dirty and ritually unclean, or to wash his

26

turban and wear his *patka* uncovered—a humiliation for a Sikh adult—while his turban dried. Neither option comports with Sikh worship practices. *See Singh v. Goord*, 520 F. Supp. 2d 487, 502 (S.D.N.Y. 2007) (holding that limiting a Sikh inmate to two turbans substantially burdened his religious practice).

195.    Defendant Officers also substantially burdened Singh's religious exercise by defiling his *Gutka Sahib* scripture, tossing it onto worn shoes on the ground. Sikhi requires daily prayer with the *Gutka Sahib*, and Sikhs must treat their *Gutka Sahib* with the highest regard, only touching it with a covered head and clean hands, and storing it in a clean, elevated place, apart from shoes and undergarments. Because his *Gutka Sahib* was defiled, Singh could not properly perform his prayer and scripture obligations. *See id.* at 504–05 (holding that preventing storage of *Gutka Sahib* in a clean, elevated place substantially burdened Sikh inmate's religious practice).

196.    Even after Singh exhausted his administrative remedies and filed this lawsuit, prison staff again subjected Singh to these burdens, defiling Singh's religious texts and turban during a shakedown on August 3, 2024. As before, the officers removed the items from their secure storage spots and threw them on the ground.

197.    As discussed above, no compelling governmental interest could justify Defendants' actions. RFRA thus entitles Singh to appropriate relief.

### *Dietary Accommodations and Medical Care*

198.    Defendant CF Sumner, the official in charge of the chow hall, violated RFRA by refusing to accommodate Singh's religious dietary restrictions that prohibit consumption of meat or meat-contaminated food. *See DeHart v. Horn*, 390 F.3d 262, 264–65 (3d Cir. 2004) (reversing the dismissal of a similar statutory claim for failure to accommodate a Buddhist inmate's diet).

199.    Additionally, Singh required—and was prescribed—a gluten-free diet for medical reasons. Yet CF Sumner did not accommodate Singh's gluten-free dietary needs, even though the

kitchen was stocked with gluten-free beans and bread.

200.    Given his gluten-free limitation, it was especially important that Singh's religious dietary needs were respected so he could consume sufficient nutrients and calories. Yet CF Sumner and other staff continued to serve Singh expired or gluten-containing food, or side dishes contaminated by contact with meat products.

201.    CF Sumner withheld these dietary accommodations because of his hostility toward Sikh inmates.

202.    Defendants entirely stopped accommodating Singh's dietary needs from July 2024 until shortly before his release in October 2024.

203.    Because of this lack of accommodation, Singh had to purchase food items from the commissary, spending a total of about $5,500. Even then, Singh was unable to receive adequate calories and nutrition.

204.    No governmental or penological interest explains why Singh and other Sikh inmates were consistently deprived of religious and medical dietary accommodations, while inmates of other faiths were provided adequate special meals. *See, e.g.*, *Jasminder Singh*, No. 24-7641 at *4–7.

205.    Singh also alleges DOES 1–10 withheld Singh's medication and prevented him from receiving needed healthcare because of their hostility toward his religion. Other Sikh inmates, upon information and belief, have encountered similar disparate treatment, and Singh has no other explanation for the actions of DOES 1–10.

206.    Defendants DOES 1–10 violated RFRA by withholding Singh's medication for extended periods because of hostility toward his religion.

207.    The difficulties Singh experienced at FCI Fort Dix, including his disregarded dietary needs, delayed medical care, and defiled religious items, were all manifestations of an

28

entrenched and systemic pattern of hostility based on Singh's minority religious beliefs. Nothing in Singh's behavior or clean disciplinary record supports any other conclusion.

208.     This pattern of discriminatory treatment hindered Singh's ability to express and practice his Sikh faith freely. He was constantly forced to choose between his religious worship and his physical and mental health. RFRA does not permit forcing him to make this choice.

209.     This conduct did not further a compelling government interest, nor can Defendants argue that defiling Singh's sacred items or preventing him from abiding by a proper and sufficient religious diet was the least restrictive means of satisfying any purported compelling interest. *See* 42 U.S.C. § 2000bb-1(a).

210.     Singh seeks all available forms of damages from Defendants in their individual capacities, as well as all appropriate declaratory and injunctive relief against Defendants in their official capacities, including but not limited to imposing the disciplinary actions required by Program Statement 3420.11, Standards of Employee Conduct, and all legal fees and costs.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Violation of the Eighth Amendment**
**Against Defendants CM Krzewska, CF Sumner, and DOES 1–10,**
**in their Individual Capacities**

211.     Singh re-alleges and incorporates by reference all preceding paragraphs herein.

212.     Upon information and belief, Sikh inmates—but not inmates of other faiths— have disproportionately encountered long delays before receiving needed healthcare.

213.     A *Bivens* claim is a judicially created remedy that allows persons to sue federal officials in their individual capacities for damages resulting from violations of constitutional rights. *See Bivens v. Six Unknown Federal Agents*, 403 U.S. 388 (1971) (identifying a cause of action for damages for a warrantless search).

214.     The Supreme Court has recognized such claims in cases involving violations of the

29

Eighth Amendment's prohibition on cruel and unusual punishment. *See Carlson v. Green*, 446 U.S. 14, 17 (1980) (holding that denying medically necessary care to a federal inmate constituted cruel and unusual punishment for which a *Bivens* action existed).

215.   In *Carlson*, federal prison officials declined to give an inmate adequate medical care for over eight hours after an asthma attack, disregarded his doctors' medical advice, and delayed his transfer to a facility where he could access adequate care. *Id.* at 16 n.1.

216.   Successful Eighth Amendment claims for failure to provide medical care require "(1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

217.   Prison officials "act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'" *Id.* at 534 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

218.   Singh suffered from a pulmonary disease related to a fungal allergy, requiring him to regularly take prescription medication before his arrest or risk bronchitis and lung damage.

219.   Because Defendants withheld Singh's medication in January 2023, he developed a chronic wheezing cough and congestion, eventually becoming so ill that he was hospitalized for two weeks. A doctor prescribed him additional medication. However, when Singh returned to FCI Fort Dix, prison staff only gave two pills that did not match the prescription and refused requests for subsequent doses of the required medication. Prison staff did not allow Singh to finish his prescribed course of treatment, without explanation.

220.   Without his medication, Singh's respiratory problems reemerged by mid-March 2023. Singh did not receive the necessary medication until May 2023.

221.    In April 2024, Singh's prescribed medication was again withheld. He was briefly provided it in September 2024, but it was again withheld in October 2024.

222.    As in *Carlson*, this denial of adequate medical care resulted in serious physical harm to Singh. Defendants were made aware of Singh's medical needs yet refused basic and medically required actions that could have prevented that serious harm.

223.    Under *Bivens* and *Carlson*, Singh seeks damages.

**PRAYER FOR RELIEF**

224.    Given the preceding allegations, Singh prays the Court grant the following relief:

    a.    Award Singh all appropriate monetary, declaratory, and equitable relief required to redress the violations of the law described herein, and to discourage their future occurrence;

    b.    Enjoin Defendants to discipline those involved in the July 7 incident and August 3 incident in accordance with Program Statement 3420.11, Standards of Employee Conduct;

    c.    Declare unlawful Defendants' discriminatory treatment of Singh and his religious articles;

    d.    Award Singh reasonable attorney's fees and costs as to all defendants;

    e.    Grant such other and further relief as the Court may deem just and proper.[3]

---

[3] Singh thanks Hussain Awan, Masooma Haider, Andrew Hayes, John Hirl, Sukhmani Kaur, Adi Kumar, Faris Rehman, John Rider, Pantho Sayed, Marisa Sylvester, and Emma Westhoff for their work in preparing this action as student attorneys for the Harvard Law School Religious Freedom Clinic.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, undersigned counsel for plaintiffs hereby certifies that the matter in controversy here is not the subject of any action pending in any other court, arbitration, or administrative proceeding.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Pursuant to Local Civil Rule 201.1, undersigned counsel for plaintiffs hereby certifies that this action is excluded from compulsory arbitration because it is based on an alleged violation of a right secured by the Constitution of the United States.

**SHAH LAW GROUP, LLC**
**ATTORNEYS AT LAW**
*Attorneys for Plaintiff Prabhjot Singh*

Dated March 7, 2025

By: /s/Roshan Shah_____
    ROSHAN D. SHAH, ESQ.

MARISSA ROSETTI, ESQ.*
**THE SIKH COALITION**
165 Broadway, Office 2359
New York, NY 10006

JOSHUA C. MCDANIEL, ESQ.*
PARKER W. KNIGHT, III, ESQ.*
KATHRYN F. MAHONEY, ESQ.*
STEVEN W. BURNETT, ESQ.*
**HARVARD LAW SCHOOL**
**RELIGIOUS FREEDOM CLINIC**
6 Everett Street, Suite 5110
Cambridge, MA 02138

*pro hac vice forthcoming*